IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

UNITED STATES OF AMERICA    )
                                )
                                )
        v.                    )
                                )     1:16-cr-207 (LMB)
                                )
BRENNAN CHRISTIAN,        )
                                )
        Defendant.        )

## MEMORANDUM OPINION

In his Motion to Suppress Evidence and for a Franks Hearing ("Motion to Suppress")
[Dkt. No. 73], defendant, who is awaiting retrial for conspiracy to distribute drugs, has moved to
suppress evidence obtained under two search warrants, one for location-information seized from
his Samsung Galaxy phone and the other for the search of an apartment in Greensboro, North
Carolina. Defendant maintains that the affidavits in support of both warrants failed to establish
probable cause and intentionally or recklessly contained false statements and omitted facts that
were material to the determination of probable cause, entitling him to a Franks hearing. For the
reasons stated in open court and in this Memorandum Opinion, which expands on those reasons,
the motion has been denied.[1]

## I.    BACKGROUND

### A. Overview of the Investigation

In 2012, the Federal Bureau of Investigation ("FBI"), in a joint investigation with several
other law enforcement agencies, began investigating a narcotics trafficking organization
operating in Prince William County, Virginia. [Dkt. No. 2] ¶ 10. Based on evidence gathered by

---

[1] On February 23, 2017, the Court issued an order denying defendant's Motion to Suppress and
stated that the reasons would "be spelled out in an opinion to issue in the future." [Dkt. No. 87].

the Prince William County Police Department ("PWCPD"), the investigation began by focusing on Tony Bowles ("Bowles"), who was "reported by multiple sources to be a substantial cocaine and crack dealer" in Northern Virginia. Id. The investigation revealed that Bowles had a large network of people through whom he distributed cocaine and crack. Id. ¶ 11. Bowles' primary source of supply was Johnnie Hill ("Hill"), who lived in Virginia. Id. ¶ 12. The investigation expanded into North Carolina when it was determined that Marciano Reza ("Reza"), a resident of North Carolina, was one of Hill's cocaine sources. Id. ¶ 13. The investigation of Reza led to defendant Brennan Christian ("Christian" or "defendant"), also a resident of North Carolina. As will be explained, Christian is also known as "Twin" and "Trey." [Dkt. No. 61] at 1.

During the course of the investigation, agents obtained court authorization pursuant to Title III to intercept the wire and electronic communications of eleven cell phones. Gov. Opp. at 2. The wiretap of Reza's phone (910-975-7648) revealed multiple drug related calls involving 786-459-1960 and on July 26, 2013 an order authorizing the interpretation of communications to and from that phone was obtained for a 30-day period (the tenth target phone or "TT #10"). Def. Ex. 1. According to the affidavit supporting that order, TT #10 was "believed to be used by an [as then] unidentified male who [was] known as 'Trey' and 'Twin.'" Id. ¶ 3. On August 27, 2013, law enforcement also sought and obtained an order authorizing the installation and use of a pen register and a trap and trace device, and the disclosure of stored wire and electronic transactional records for TT #10 for a period of 60 days. Def. Ex. 2.

**B. The Warrants**

The first search warrant at issue in defendant's Motion to Suppress includes authorization for the disclosure of location based services and disclosure of stored telecommunications records for 30 days for a different telephone number, 336-254-9858 ("the Samsung Galaxy"), which

agents identified as a telephone number Christian used to communicate with his probation officer. Def. Ex. 3.[2] The warrant, which was issued on October 9, 2013, required the service provider to create and disclose records using so-called "Enhanced 911" tools, such as GPS fixes, triangulation and cell-site "pings." Id. ¶ 3; Pafford Aff., Def. Ex. 4 ¶ 65. For this reason, this warrant will herein be referred to as the Ping Warrant.

Under this kind of order, the provider will send a query to the subject phone. If the phone is powered on, the provider will be able to transmit the location information to the investigative agency either orally or in writing. Id. According to the supporting affidavit by FBI Special Federal Officer Joshua Pafford ("Pafford Affidavit"), one of the purposes of obtaining location data was to "assist law enforcement in . . . identifying the locations where [the suspects were] conducting drug trafficking-related activity." Id. ¶ 60.

On October 15, 2013, approximately one week after the Ping Warrant was authorized, seventeen defendants, including Bowles and Hill, were charged in a criminal complaint in this district court with conspiracy to distribute 500 grams or more of cocaine and 28 grams or more of cocaine base, in violation of 21 U.S.C. §§ 846 and 841(a)(1). See Case No. 1:13-mj-611. In a separate complaint, five other defendants, including Reza and Christian, were charged with conspiracy to distribute five kilograms or more of cocaine. See Case No. 1:13-mj-612. Arrest warrants were executed in a coordinated and simultaneous fashion on October 17, 2013. Gov. Opp. at 20. All of the charged persons except Christian were arrested. Id. at 2. Officers attempted to arrest Christian at 1101 Anderson Place in High Point North Carolina, the address he had on

---

[2] Though this document is actually an order, the parties refer to it as a "warrant" and the Court will employ their terminology for the sake of clarity.

record with his probation officer, but were unsuccessful, id. at 21, and Christian remained at large until May 2016, id. at 2.[3]

On October 18, 2013, one day after the initial arrests were made, agents obtained a warrant for another location where they believe Christian stayed, 7027 West Friendly Avenue, Apartment B, Greensboro, North Carolina ("the Apartment B warrant"). Def. Ex. 24. The supporting affidavit by FBI Special Agent Norman Kuylen ("Kuylen Affidavit") represented that "[l]aw enforcement ha[d] determined that [Christian] reside[d]" at that address based on location data obtained from the Ping Warrant, as well as from physical surveillance, statements from the apartment manager, and statements from the resident of a nearby unit, which agents believed established probable cause that the defendant resided in Apartment B. Kuylen Aff., Def. Ex. 25. ¶¶ 10-12, 14. The affidavit also represented that "there [was] probable cause to believe that the individual exercising control over the target location is actively involved in a conspiracy to distribute cocaine and that he has discussed explicitly, or other evidence has established, that within his residence he maintains items related to his involvement in the conspiracy." Id. ¶ 15. Although agents did not find Christian in Apartment B, they recovered several phones, including TT # 10, which is among the objects defendant wants to suppress. Gov. Opp. at 2.

## II.    DISCUSSION

### A. Standard of Review

The moving party has the burden to prove that suppression is proper. United States v. Simmons, 107 F. Supp. 2d 703, 705 (E.D. Va. 2000). "Once the defendant establishes a basis for his motion to suppress, the burden shifts to the government to prove the admissibility of the

---

[3] Defendant was ultimately arrested in North Carolina, Gov. Opp. at 2, and later indicted in the Eastern District of Virginia for one count of conspiracy to distributed five kilograms or more of cocaine, [Dkt. No. 61].

challenged evidence by a preponderance of the evidence." United States v. Gualtero, 62 F. Supp. 3d 479, 482 (E.D. Va. 2014). The moving party's burden is proof by a preponderance of the evidence. United States v. Matlock, 415 U.S. 164, 178 n.14 (1974). "In the course of deciding a motion to suppress, the district court may make findings of fact, as well as rulings of law." United States v. Stevenson, 396 F.3d 538, 541 (4th Cir. 2005).

A court reviewing a magistrate judge's decision to authorize a search warrant is to "accord great deference to the magistrate's assessment of the facts presented to him," United States v. Blackwood, 913 F.2d 139, 142 (4th Cir. 1990), and looks to whether there was a "substantial basis for . . . conclud[ing]" that probable cause existed, Jones v. United States, 362 U.S. 257, 271 (1960). In addition, "The validity of the warrant must be assessed on the basis of the information that the officers disclosed, or had a duty to discover and to disclose, to the issuing Magistrate," not on after-acquired evidence. Maryland v. Garrison, 480 U.S. 79, 86 (1987).

## B. Analysis

### 1. Fourth Amendment Principles

"The Fourth Amendment requires that warrants (1) be issued by a neutral and detached magistrate, (2) be based upon probable cause supported by oath, and (3) contain a particular description of the place to be searched and things to be seized." United States v. Clutchette, 24 F.3d 577, 579 (4th Cir. 1994). Probable cause to search is "a fair probability that contraband or evidence of a crime will be found." Illinois v. Gates, 462 U.S. 213, 238 (1983). It is "a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules," id. at 232, and thus requires a "totality-of-the-circumstances analysis," id. at 238. A magistrate judge reviewing a warrant application for

probable cause makes "a practical, common-sense decision . . . , given all the circumstances set forth in the affidavit before him." Id. An affidavit submitted in support of a search warrant application is presumed valid. Franks v. Delaware, 438 U.S. 154, 171 (1978).

"The particularity requirement is fulfilled when the warrant identifies the items to be seized by their relation to designated crimes and when the description of the items leaves nothing to the discretion of the officer executing the warrant." United States v. Williams, 592 F.3d 511, 519 (4th Cir. 2010). The Framers included the particularity requirement to end the practice of issuing general warrants, which is to say "a general, exploratory rummaging in a person's belongings." Coolidge v. New Hampshire, 403 U.S. 443, 467 (1971). Nevertheless, a warrant does not impose a "constitutional strait jacket" on law enforcement officers. United States v. Dornhofer, 859 F.2d 1195, 1198 (4th Cir. 1988) (internal quotation marks omitted). In this vein, "[c]ourts must refrain from interpreting warrant terms in a 'hypertechnical' manner, and should instead employ a 'commonsense and realistic' approach." United States v. Dargan, 738 F.3d 643, 647 (4th Cir. 2013) (citing Williams, 592 F.3d at 519).

In the Fourth Circuit, a warrant generally satisfies the particularity requirement when it allows officers "to seize only evidence of a particular crime." United States v. Fawole, 785 F.2d 1141, 1144 (4th Cir. 1986). For example, in United States v. Ladd, 704 F.2d 134 (4th Cir. 1983), the Fourth Circuit upheld a search warrant giving officers the discretion to seize all property relating to "the smuggling, packing, distribution and use of controlled substances," as satisfying the particularity requirement. The Ladd court held that "[m]ore specificity is not required by the Constitution." Id. at 136. Similarly, in United States v. Anthony, 4 F.3d 986 (4th Cir. 1993), the Fourth Circuit upheld a warrant that authorized the agents' search of evidence relating to the crime of bank robbery, finding that although the warrant was "certainly broad in its description"

it did not fail to "provide that degree of specificity required by the precedent of this court." Id. These cases illustrate the principle that, although a warrant authorizing a search for evidence relating to "general criminal activity" such as "fraud" or "conspiracy" is "overbroad because it 'provides no readily ascertainable guidelines for the executing officers as to what items to seize,'" "a warrant authorizing a search for evidence relating to 'a specific illegal activity,' such as 'narcotics,' or 'theft of fur coats' is sufficiently particular." United States v. Dickerson, 166 F.3d 667, 694 (4th Cir. 1999) (citing United States v. George, 975 F.2d 72, 76 (2d Cir. 1992)), rev'd on other grounds, 530 U.S. 428 (2000).

Generally, evidence seized during an unlawful search, such as when a warrant lacks probable cause or fails to identify the particular items to be seized, will be suppressed, as will "fruit of the poisonous tree," Wong Sun v. United States, 371 U.S. 471, 484-85 (1963); however, under the "good faith exception" established in United States v. Leon, the exclusionary rule does not apply to evidence obtained by officers acting in reasonable reliance on a search warrant issued by a detached and neutral magistrate but ultimately found to be invalid. 468 U.S. 897, 920 (1984). This is proper because, in these circumstances, suppression would not deter unlawful police conduct. Id. As the Fourth Circuit has explained, the Leon court identified four situations in which it would not be reasonable for an officer to rely on an invalid search warrant:

> (1) the magistrate was misled by information in an affidavit that the officer knew was false or would have known was false except for the officer's reckless disregard of the truth;

> (2) the magistrate wholly abandoned his detached and neutral judicial role;

> (3) the warrant was based on an affidavit that was so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; and

(4) the warrant was so facially deficient, by failing to particularize the place to be searched or the things to be seized, that the executing officers cannot reasonably presume it to be valid.

United States v. Hyppolite, 65 F.3d 1151, 1156 (4th Cir. 1995).

A criminal defendant seeking to avail himself of the exclusionary rule "is generally not entitled to challenge the veracity of a facially valid search warrant affidavit." United States v. Allen, 631 F.3d 164, 171 (4th Cir. 2011). The narrow exception to this rule, articulated in Franks, provides that a defendant who makes "a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit" is entitled to an evidentiary hearing concerning the veracity of statements in the affidavit. 438 U.S. at 155–56. This is sometimes called Franks' intentionality prong. In addition, Franks includes a materiality prong which requires that a defendant must also show that the false information is "necessary" to the probable cause determination. Id. at 171–72. As the Supreme Court emphasized, "To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof." Id. at 171.

The two-pronged Franks test also applies to cases "when an agent omits relevant facts from the affidavit." United States v. Lull, 824 F.3d 109, 114 (4th Cir. 2016) (emphasis in original). In the context of an omission, the defendant must show that the "affiants omit[ted] material facts with the intent to make, or in reckless disregard of whether they thereby made, the affidavit misleading." United States v. Colkley, 899 F.2d 297, 300 (4th Cir. 1990) (citation and internal quotation marks omitted). "A showing that the officer acted negligently, or that the omission was merely an innocent mistake, is insufficient to warrant suppression." Lull, 824 F.3d

at 115. Thus, "the defendant's burden in showing intent is greater in the case of an omission because '[a]n affiant cannot be expected to include in an affidavit every piece of information gathered in the course of an investigation." Id. (quoting Colley, 899 F.2d at 300). "One way of establishing reckless disregard is by proffering 'evidence that a police officer failed to inform the judicial officer of facts [he] knew would negate probable cause." Id. at 117 (citing Miller v. Prince George's County, 475 F.3d 621, 627 (4th Cir. 2007)). "[T]he significance—or insignificance—of a particular omission to the determination of probable cause may inform [the court's] conclusion regarding the agent's intent." Id. The materiality standard for omissions mirrors that for misinformation: the defendant must show that the omission is "necessary to the [neutral and disinterested magistrate's] finding of probable cause." United States v. Wharton, 840 F.3d 163, 168 (4th Cir. 2016) (citing Franks, 438 U.S. at 156) (alteration in original). Even if information is relevant, it is not material unless 'its inclusion in the affidavit would defeat probable cause.'" Id. at 168–69 (citing Colkley, 899 F.2d at 301).

Under both Franks and Lull, to assess materiality a court must correct the affidavit by either excising the misrepresentation or "insert[ing] the facts recklessly [or intentionally] omitted," and then "determine whether or not the corrected warrant affidavit would establish probable cause." Lull, 824 F.3d at 169 (citing Miller, 475 F.3d at 628).

2. Ping Warrant for the Samsung Galaxy Phone

Defendant argues that the affidavit in support of the Ping Warrant lacked probable cause because it contained the materially false statement that the affiant believed defendant had stopped using TT #10 to communicate with co-conspirators and was using the Samsung Galaxy for such communication. Def. Mem. at 11-12. In addition, he claims he is entitled to a Franks hearing because the affidavit contained "intentionally or recklessly false or misleading

representations" and "omitted information material to the finding of probable cause with the intent to mislead the magistrate, or with reckless disregard of whether it would make the affidavit misleading." Def. Mem. at 7, 13.

a. The Affidavit

Investigators applied for the Ping Warrant on October 8, 2013. Pafford Aff. at 1. The affidavit in support of the application was prepared by Joshua Pafford who stated that he had been a law enforcement officer with the PWCPD since 2005 and was then acting as a Special Federal Officer of the FBI. Id. Drawing on wiretap records and other evidence, the Pafford Affidavit described in detail a series of conversations, one set ranging from June 6-7, 2013, and the other from June 28-29, 2013, "that capture clearly the relationship between" Reza, Christian, and the other co-conspirators. Id. ¶ 50.

The affidavit described the incident on June 6-7, 2013 as follows:

> On June 6, 2013, at 3:45 p.m., TREJO called MARCIANO [i.e., Reza] and brokered a deal with him for ten kilograms of cocaine at a price between $35,000 and $36,000 per kilogram.

> CHRISTIAN called MARCIANO at 6:20 p.m. from a new telephone number and told MARCIANO, "What's up brother, this is my new number and shit." MARCIANO then told him about the deal he brokered with TREJO. "He was gonna let me get it for thirty-six. . . . But he's still gonna front 'em to me. I'm just waiting on him to call me. . . . Yeah, so I might just put like five on you, something like that. He give me, he give me, he give me a week on it." CHRISTIAN replied, "Okay, alright. I gotcha." I believe MARCIANO was explaining that he would get the kilograms at $36,000 a piece but that all or a portion of the cocaine would be fronted and he would have a week to pay off the entire cost of the deal. I further believe he was going to give Christian five of the kilograms.

> At 6:51 p.m., MARCIANO spoke again with TREJO and asked if the deal would take place that day or the next. TREJO said he was told the person with the cocaine would be ready that day to do the deal.

> . . . .

At 8:06 p.m. MARCIANO called TREJO and told him that the deal would have to wait until the next day.

At 9:10 p.m., MARCIANO told CHRISTIAN, "I was suppose [sic] to see them in the a.m., early in the morning." He added, "Hell, yeah. So soon as I get them in my hands, I'll call ya."

At 9:16 p.m., MARCIANO told TREJO that he had only been able to gather up "eighty-nine bucks," which I believe meant $89,000. TREJO said the person with the cocaine was expecting "one hundred bucks," which I believe meant $100,000. MARCIANO said he would see what he could do to get the remaining balance.

. . . .

[On June 7, 2013,] [a]t 3:23 p.m., MARCIANO called CHRISTIAN and told him, "They came through, man." He continued, "I was gonna give you two in the morning, too." CHRISTIAN responded, "Oh, okay." In reference to the person from whom MARCIANO got the cocaine, MARCIANO explained, "He said as soon as I finish this, I'll go get some more."

At 3:45 p.m., MARCIANO called VENANCIO, who asked, "You still got the other one for me, don't you? "MARCIANO replied, "That, that how many you wanted?" VENANCIO said, "Three." MARCIANO responded, "Okay, yeah. Cause, um, you're getting three; Lax [shortened form of JAIME's first name] want two; I'm giving Twin [CHRISTIAN's nickname] two, Pancho [FRANCISCO's nickname] getting one, and I'm getting one." That accounted for the nine kilograms MARCIANO had obtained earlier that day.

Id. ¶ 51(a)-(c), (e)-(g), (s)-(t) (first alteration added) (internal citations omitted).

The second series of conversations began on June 28, 2013 and was described in the

Pafford Affidavit as follows:

On June 28, 2013, at 5:36 p.m., CHRISTIAN texted MARCIANO: "He ready." I believe CHRISTIAN was telling MARCIANO that his (CHRISTIAN's) source of supply had cocaine.

MARCIANO immediately called VENANCIO, telling him, "Nah, um, Twin just hit me back. Say old boy got something."

. . . .

At 5:59 p.m., MARCIANO called CHRISTIAN and said, "I'mma let you know in a little bit what, um, to place the order. I might need more than, uh, more than three."

. . . .

MARCIANO called Christian a few minutes [after 6:07 p.m.] and asked, "Old boy won't throw you nothing?" by which I believe he was asking if CHRISTIAN's source of supply would front any of the cocaine. MARCIANO went on to explain, "Yeah, cause I was saying, I'll bring the bread right back. . . . I'll get it at the end. One of them Indian cats [which is how MARCIANO and JAIMES refer to JAIMES's customer] want two of 'em." MARCIANO continued, "[J]ust tell him I'd like one, though, and bring the bread right back. . . . Yeah, cause I got, I, we got, I think I got, we got change for like three. Some shit like that." CHRISTIAN said, "Okay, okay. Let me holler at him and see," MARCIANO followed up, "Okay. And just let me know. If not, I'mma try to go and cash out before though." I believe MARCIANO was saying that he could pay for three kilograms up front, but wanted to know if CHRISTIAN's source would front the two kilograms intended for JAIMES's customer.

At 11:14 a.m. on June 29, 2013, MARCIANO called CHRISTIAN and asked, "You ain't holler at old boy about, um, seeing if he could throw you one, too?" CHRISTIAN replied, "[H]e act like he can't do it." MARCIANO tried to explain that they would not steal from the source and would be able to pay him quickly: "Cause ain't want nobody to be ripping or running. Cause I got dude, dude want two, another cat want one, and all of them be gone as soon as I get down the road." CHRISTIAN did not say it was possible, so MARCIANO said later, "Okay, then, yeah. Cause, um, I was going to say, um, yeah I might, I'mma, I might have been able to do three for right now." I believe that CHRISTIAN's source was not going to front MARCIANO any cocaine, so MARCIANO had to limit his order to three kilograms, which is what he, VENANCIO, FRANCISCO, and JAIMES had between them to pay for the cocaine up front.

It appeared from the calls and text messages between MARCIANO and CHRISTIAN that they met at around 3:45 p.m. to travel together to the deal with CHRISTIAN's source.

. . . .

MARCIANO called CHRISTIAN at 5:41 p.m. and told him, "Yeah, it look good, though. She look, this 'bout the best I seen it look, though." He continued, "It had the number. It's got the numbers on it again." CHRISTIAN replied, "Yeah, I could see the numbers. It got like, '88' on it, right?" MARCIANO said, "Yeah, I think it's a '5-8,' some shit like that." I know that kilograms of cocaine often come from Mexico with images or numbers stamped, or pressed, into the cocaine. This is sought after by drug traffickers because they

feel that cocaine kilograms with stamps are less likely to have been "stepped on," or mixed with a cutting agent, and therefore will be of a higher quality.

Id. ¶ 52(a)-(b), (f), (h)-(j), (l) (first alteration added) (internal citations omitted).

Although the affidavit refers to "CHRISTIAN," the calls actually reference "Twin" as the user of TT #10. The affidavit explained that law enforcement identified the caller using TT #10 as Christian in August 2013 through the following evidence: At 5:45 p.m. on August 6, 2013, Reza called the man investigators then knew as "Twin" and "Trey" and during the call "Twin" told Reza, "I just hit your wife up on Facebook, but tell her never mind." Id. ¶ 53(a). Agent's obtained a search warrant for the Facebook account of Reza's wife and found an August 6, 2013 post at 5:42 p.m. saying "Hey cuzn have yall lef 4 beach yet? Tell j I said give me a call." Id. The affiant explained that Reza is Marciano Reza, Jr., for which "j" is an abbreviation. Id. The posting was made by the user of a Facebook account in the name of BrennanChristian and the photograph on the profile of Brennan Christian matched a prior booking photo of the defendant, who was, at the time, on probation for charges related to dealing cocaine. Id. In addition, the affiant described that a record search revealed that Christian was born in September and lived in High Point, North Carolina. Id. ¶ 53(b). The September birthday was consistent with an earlier call in which the speaker identified as "Twin" told Reza he had a birthday in September and cell site location data from TT #10 "showed it had a definitive link to the area of High Point, North Carolina." Id. Agents also determined that Christian had a twin brother named Brent, who had been incarcerated since June 2012 for cocaine distribution. Id. ¶ 53(c).

The affiant then explained the basis for his belief that Christian had started "using [the Samsung Galaxy] to communicate with co-conspirators." Id. ¶ 54. This included Christian giving his probation officer the Samsung Galaxy's telephone number as his contact number, id. ¶ 54(a), Christian answering the phone when officers placed a ruse call to it on October 7, 2013, id. ¶ 58,

13

law enforcement databases showing that between March 5, 2013 and July 22, 2015 the Samsung Galaxy was in contact with Christian's incarcerated brother Brent 23 times, and had contact with two numbers subscribed to by "Jamie Christian" 48 times between June 19, 2013 and July 17, 2013, id. ¶ 54(b). Pafford stated that he believed that Jamie Christian was Christian's other brother Jamie Lamont Christian and that Jamie had been arrested in June 2011 in North Carolina and charged with three counts of trafficking cocaine. Id. ¶¶ 54(b), 55. In addition, based on a wiretap call from August 22, 2013, Pafford represented that he believed "Jamie [was] still trafficking in cocaine and [was] doing so in concert with Christian." Id. ¶ 56. In that conversation. Christian asked Raul Rebollar, described as one of his co-conspirators, about supplying his "brother." Id.

> CHRISTIAN: [W]hat you up to?
>
> REBOLLAR: Nothing, nothing man. Just here chilling. What about you?
>
> CHRISTIAN: Oh, uh, nothing. About to get to work, about to get to it. Hey, but, look here, um, you remember what you did last time? Uh, cause I don't really, that's my brother man. I ain't really trying to damn text him like that.
>
> REBOLLAR: Yeah.
>
> CHRISTIAN: Uh, you wanted, you wanted to do two like you did time, and I just, um, take care of it like that? Or . . .
>
> REBOLLAR: Oh, wh-, wh-, how much you think? How long does it take him to move those two?
>
> CHRISTIAN: I'm talking about, like, what you did for me? And I'll just be responsible for it.
>
> . . . .
>
> REBOLLAR: I mean if you want, if, if you think he's cool man, I'll let him get 'em for the three eight, if you, if you say he's cool.
>
> CHRISTIAN: That's my brother man!
>
> REBOLLAR: Yeah, okay. That's all I need to know boss.

CHRISTIAN: Okay.

Id.

After reviewing the warrant application, the court entered an order directing the service

provider to "disclose the results . . . of any and all available location-based services, including

but not limited to Global Position System ("G.P.S.") or any geo-location coordinates associated

with the mobile device, precision location information, real time cell-site data, and those

'Enhanced-911' services developed by Sprint-Nextel" for the Samsung Galaxy for a period of 30

days. Def. Ex. 3 ¶¶ 3-4.

    b.  Probable Cause Analysis

Defendant raises two challenges to the probable cause for the Ping Warrant: nexus and

particularity. First, he contends that the affidavit "contained no facts from which the magistrate

could properly infer a nexus between the Samsung Galaxy and future drug trafficking activity on

Christian's part," as it "failed to establish that the Samsung Galaxy was being used by Christian

to set up or consummate drug transactions, or that Christian was communicating on the Samsung

Galaxy . . . with any of his co-conspirators." Def. Mem. at 11-12.

As the government emphasizes, Gov. Opp. at 17-18, the defendant's argument that

probable cause for a location information warrant requires law enforcement to establish a

connection between the phone and criminal activity rests entirely on a single district court case,

United States v. Powell, 943 F. Supp. 2d 759 (E.D. Mich. 2013), which held that "a specific

showing is required to establish probable cause when the government seeks a warrant for long-

term real-time tracking of an individual via a cell phone." Id. at 778. This showing requires facts

demonstrating that the "actual location of the person the government intends to track via the cell

phone is relevant to the investigation of the ongoing crime, or evidence sought," and "that a

criminal suspect under investigation is the likely user of the cell phone at issue and that he or she

uses the cell phone in connection with criminal activity." Id. at 778-79. The court reasoned that

this specific showing was compelled because "tracking a phone used in furtherance of criminal

activity is likely to lead to evidence of criminal activity, whereas tracking phones, the use of

which is unconnected to criminal activity, will likely demonstrate where a person conducts

highly personal business." Id. at 779. The court found that the affidavit satisfied "traditional

probable cause analysis" because "a substantial basis existed to find probable cause that Carlos

Powell was a drug dealer and that tracking his cell phone would lead to evidence of a crime;"

however, the court went on to find that the novel cell-phone tracking standard it was applying

had not been satisfied because the affidavit failed to establish "a nexus between the cell phone

and the criminal activity." Id. at 782-83. Nevertheless, the court found that the good faith

exception applied and denied the motion to suppress. Id. at 783.[4]

Because there is no basis in any Fourth Circuit or controlling Fourth Amendment

jurisprudence for the Powell court's requirement that such affidavits must establish that the cell

phone itself is used in connection with criminal activity, the Court declines defendant's invitation

to follow it here. It is fundamental that "to establish probable cause, the facts presented to the

magistrate need only 'warrant a man of reasonable caution' to believe that evidence of a crime

will be found." United States v. Williams, 974 F.2d 480, 481 (4th Cir. 1992) (per curiam)

(quoting Texas v. Brown, 460 U.S. 730, 742 (1983) (plurality opinion)). The factual showing

that is required to justify the search of a specific item stems from the Fourth Amendment's nexus

---

[4] On appeal, the district court's specific cell-phone tracking standard, was not adopted by the Sixth Circuit. See United States v. Powell, 847 F.3d 760, 769 (6th Cir. 2017). The court of appeals observed that "despite finding that the affidavit would not satisfy its own newly articulated probable-cause standard," the district court "concluded that it provided a substantial basis for the magistrate judge to find probable cause to issue the warrant 'under traditional probable cause analysis.'" Id. Rather than engaging with the district court's unique probable cause standard, the Sixth Circuit panel affirmed on the basis that the good faith exception applied. Id. at 770.

requirement, not particularity, as the Powell court suggests. Although a connection "between the item to be seized and criminal behavior," exists automatically when the items to be seized are fruits, instrumentalities, or contraband, Warden v. Hayden, 387 U.S. 294, 307 (1967), police may also seize "mere evidence," in which case "probable cause must be examined in terms of cause to believe that the evidence sought will aid in a particular apprehension or conviction." Andresen v. Maryland, 427 U.S. 463, 483 (1976). It bears emphasizing that the nexus test established by Andresen is not a stringent one, nor is it calibrated based on the intrusiveness of the search. Id. "A sufficient nexus can exist between a defendant's criminal conduct and [the place to be searched] even when the affidavit supporting the warrant contains no factual assertions directly linking the items sought to [that place]." United States v. Grossman, 400 F.3d 212, 217 (4th Cir. 2005) (internal quotation marks omitted). Instead, "the nexus between the place to be searched and the items to be seized may be established by the nature of the item and the normal inferences of where one would likely keep such evidence." United States v. Anderson, 851 F.2d 727, 729 (4th Cir. 1988). In the context of a ping warrant, the place to be searched is the subject phone, and the item to be seized is location data. Therefore, the nexus requirement is satisfied by an inference that the subject phone will be a source of location information regarding criminal activity.

Powell's requirement that the affidavit demonstrate that the target cell phone itself is used in connection with criminal activity effectively requires that the phone must be an instrumentality of criminal activity. This position is directly contradicted by the Supreme Court's decision in Warden, which states that "[n]othing in the language of the Fourth Amendment supports the distinction between 'mere evidence' and instrumentalities." 387 U.S. at 301.

Against this background, the Powell court points to no legal authority that requires a higher nexus showing for cell phone location information searches and this Court is aware of none.

The conclusion that the affidavit does not have to demonstrate that the subject phone is used to conduct criminal activity is consistent with the Fourth Circuit's decision in United States v. Gibbs, which considered three factors in concluding that the GPS monitoring of a cell phone was supported by probable cause: the existence of criminal activity, a link between the person whose phone was to be tracked and that criminal activity, and whether location information would likely reveal evidence of the crime. 547 F. App'x 174, 179 (4th Cir. 2013).[5] All three of these factors are established in Christian's case: the affidavit in support of the warrant provides ample evidence of a criminal conspiracy to distribute cocaine, it indicates that the defendant was actively involved in procuring and distributing that cocaine, and it established that law enforcement officers needed information about defendant's location to identify the locations where the drug trafficking activity was taking place. As to the nexus between the Samsung Galaxy and the defendant, the affidavit's representations that the defendant provided the Samsung Galaxy number to his probation officer and answered the phone in response to a ruse call are sufficient to establish that it was likely that he would be carrying the phone, and the ample evidence from wiretap calls established that the defendant was engaged in drug dealing, used multiple cell phones to communicate with his co-conspirators regarding drug transactions, and that tracking his location would "aid in a particular apprehension or conviction." Andresen, 427 U.S. at 483.

---

[5] The Court acknowledges that the target telephone in Gibbs was used in furtherance of the suspected criminal activity; however, this fact was not discussed in the Fourth Circuit's nexus analysis. Id. at 177-78.

Defendant further contends that the "affidavit contained no facts from which the magistrate could reasonably infer that the Samsung Galaxy (as opposed to TT #10) would be located at a particular place where contraband or evidence of a crime were likely to be found." Def. Mem. at 9, 11-12. This contention, which is essentially another nexus argument, is easily rejected. As stated above, nexus "may be established by the nature of the item and the normal inferences of where one would likely keep such evidence." Anderson, 851 F.2d at 729. Given the evidence of drug distribution set forth in the affidavit, it was reasonable to infer that the defendant would be present at locations where contraband was likely to be found and common sense supports the inference that the Samsung Galaxy would be on the defendant's person.

Next, defendant attacks particularity, arguing that the affidavit "failed to show the actual locations the government intended to track or how they were relevant to the investigation of the ongoing crime." As with his nexus argument, defendant relies exclusively on a district court case from outside the Fourth Circuit, United States v. White, 62 F. Supp. 3d 614 (E.D. Mich. 2014) in which a defendant charged with drug distribution moved to suppress evidence obtained through two successive search warrants for cell phone location data, arguing that the warrants were "overbroad because they authorize[d] the police to track him everywhere and continuously for 30 days at a time." Id. at 626. Picking up on Powell's requirement that the government must show that the "location of the person the government intends to track via the cell phone is relevant to the investigation of the ongoing crime, or evidence sought," 943 F. Supp. 2d at 778–79, the White court concluded that the mere fact that "law enforcement anticipates that a suspect will commit a crime some place at some future date, does [not] mean that law enforcement has probable cause to track a suspect every place he goes." 62 F. Supp. 3d at 627 (emphases in original). The court found that the 30-day search of White's phone was therefore overbroad. The

19

court proceeded to qualify its holding, explaining that "police could have satisfied the particularity requirement by presenting a more tailored application." Id. at 628. A tailored application might, for example, have sought to "track White for a limited period based on credible information that White was planning to engage in a drug transaction . . . at a particular time and place," explained that he was travelling to meet with his suppliers, or averred that "White stored drugs in one location and sold them out of another." Id.

The Fourth Amendment's requirement that a warrant "particularly describing the place to be searched, and the persons or things to be seized," U.S. Const., amend. IV, proscribes the issuance of general warrants and serves as a bulwark against invasions of privacy. See Payton v. New York, 445 U.S. 573, 583 (1980) ("It is familiar history that indiscriminate searches and seizures conducted under the authority of 'general warrants' were the immediate evils that motivated the framing and adoption of the Fourth Amendment." (footnote omitted)); Andresen, 427 U.S. at 492 ("[T]he requirement . . . that a warrant specify with particularity the place to be searched and the things to be seized is imposed to the end that 'unauthorized invasions of the sanctity of a man's home and the privacies of life' be prevented." (citing Berger v. New York, 388 U.S. 41, 58 (1967))). And the Supreme Court has repeatedly emphasized the weighty interests associated with cell phones. In Riley v. California, the Court held that cell phone contents were outside the Fourth Amendment's search-incident-to arrest exception because "[c]ell phones differ in both a quantitative and a qualitative sense from other objects that might be kept on an arrestee's person." 134 S. Ct. 2473, 2489 (2014). Simply put, "they hold for many Americans "the privacies of life." Id. at 2494–95 (internal quotation marks omitted). Indeed, one of the unique forms of private information identified by the Riley Court was "location information . . . [that] can reconstruct someone's specific movements down to the minute, not

only around town but also within a particular building." Id. at 2490. This observation draws on

Justice Sotomayor's concurrence in United States v. Jones, where she explained that "GPS

monitoring generates a precise, comprehensive record of a person's public movements that

reflects a wealth of detail about her familial, political, professional, religious, and sexual

associations." 565 U.S. 400, 415–16 (2012). These associations might include "trips to the

psychiatrist, the plastic surgeon, the abortion clinic, the AIDS treatment center, the strip club, the

criminal defense attorney, the by-the-hour motel, the union meeting, the mosque, synagogue or

church, the gay bar and on and on." Id. (quoting People v. Weaver, 909 N.E.2d 1195, 1199 (N.Y.

2009)).

Although future developments in the law may impose unique particularity requirements

on cell phone ping warrants, under the facts in this case, which show the extensive use of cell

phones to engage in a wide-ranging drug conspiracy, the Court finds that the Ping Warrant did

not violate defendant's Fourth Amendment privacy rights.

c. Good Faith

Even if defendant were correct that a ping warrant requires a stronger nexus or greater

particularity than was present in this affidavit, his motion to suppress still fails under the Leon

good faith doctrine, which provides that evidence obtained by officers acting in reasonable

reliance on a search warrant issued by a neutral magistrate should not be suppressed unless one

of four exceptions applies. 468 U.S. at 920. Defendant claims that the "first and third of these

exceptions render [the] good faith exception inapplicable." Def. Mem. at 19. The first Leon

exception applies when "the magistrate was misled by information in an affidavit that the officer

knew was false or would have known was false except for the officer's reckless disregard of the

truth." Hyppolite, 65 F.3d at 1156. This argument mirrors defendant's Franks argument, which will be rejected for the reasons discussed below.

The third exception applies when "the warrant was based on an affidavit that was so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." Id. This argument is clearly without merit. First, no Fourth Circuit case law supports the unique probable cause standard for ping warrants advanced by the defendant. Second, the affidavit provided ample indicia of probable cause. As explained above, the Pafford affidavit set forth detailed facts establishing the existence of an extensive drug trafficking conspiracy, quoted numerous wiretapped conversations that directly linked the defendant to that activity, and explained the relevance of location information to the investigation. In light of these factual representations, the resulting warrant was not facially invalid and it was not unreasonable for the officers to rely upon it. In fact, defendant's argument is belied by Powell which found under closely analogous factual circumstances that the affidavit in support of the warrant satisfied "traditional probable cause analysis." 943 F. Supp. 2d at 782 (emphasis added). In addition, both of the Eastern District of Michigan cases cited by defendant, despite finding that probable cause was lacking under their new, heightened standards, ultimately denied the motions to suppress on the basis of the good faith exception. See White, 62 F. Supp. 3d at 631; Powell, 943 F. Supp. 2d at 783.

d. Franks Hearing

Defendant argues that the first Leon exception applies because the affidavit contained two material misrepresentations and omitted eight material facts, which he claims entitle him to an evidentiary hearing pursuant to Franks. Def. Mem. at 7-8, 13-17. A defendant is entitled to an

evidentiary hearing only if he can demonstrate both intentionality and materiality. Franks, 438

U.S. at 155-56, 171-72.

The alleged misrepresentations and omissions are effectively two sides of the same coin

and go to the extraneous question of whether the affidavit established probable cause to believe

that the defendant was using the Samsung Galaxy in connection with drug activity. As discussed

above, the affiant was not required to show that the Samsung Galaxy itself was used to carry out

drug activity, but, in the interest of thoroughness, the Court will address this argument.

The two alleged misrepresentations alleged by defendant are:

> (1) "Based on toll records and other information, to your affiant's knowledge, [the
> defendant] has stopped using the telephone numbers he used to communicate with
> [Reza] in the above-described communications, to include [TT #10]." Pafford
> Aff. ¶ 54.

> (2) "Your affiant believes that [the defendant] is now using [the Samsung Galaxy]
> to communicate with co-conspirators." Id.

Def. Mem. at 7.

Of defendant's eight alleged omissions six deal with pen register and trap and trace

records (collectively "toll records") logging communications between the defendant and his co-

conspirators, particularly Reza. According to the defendant, the toll records show that defendant

had not stopped using TT #10 and was still using it on October 8, 2013 (the date Pafford swore

to the affidavit) to communicate with Reza and other co-conspirators. Id. Specifically, defendant

claims that the toll records from TT #10 show that for the period August 22, 2013 to October 21,

2013, there were 270 incoming and outgoing calls between TT #10 and Reza's phone and that

over the same period, toll records from Reza's phone show 272 incoming and outgoing calls

between TT #10 and Reza's phone and no calls between Reza's phone and the Samsung Galaxy.

Id. In addition to omission of the toll record data, defendant criticizes the affidavit for not

mentioning that the defendant used two other cell phone numbers to communicate with co-conspirators at the same time he was using the Samsung Galaxy to communicate with his probation officer. Id. Lastly, defendant argues that "the affidavit failed to disclose that law enforcement did not need the tracking warrant to locate Christian's residence" because they had an address on file from his probation officer. Id.

With respect to defendant's toll data argument, the government points out that because the ping warrant was signed on October 8, 2013, any toll data obtained after the affidavit was sworn out could not have been included and that because the practice in this district is for the government to submit draft search warrant applications to the duty magistrate in advance of the appointment to swear out the affidavit, at best the affiant would have last checked the toll records on October 7, 2013. Gov. Opp. at 9-10. The Court agrees that the only relevant toll data was for the time before October 7, 2013.

The government also argues that the relevant toll record data shows that communication between Reza and TT #10 diminished markedly during the relevant time period, falling from an average of 9 contacts per day in late July and early August to 4.5 contacts per day from August 22 to October 7, 2013. Id. at 10. In addition, although TT #10 contacted Reza's phone nearly every day from August 22 to September 24, 2015, after September 24, five days elapsed before the next contact on September 30, and after that, four days elapsed before the next contact on October 4, and another two days before the next contact on October 7. Id. at 10-11. On October 7, all of the calls were from Reza to TT #10 went unanswered. Id. at 11. According to the government, "to experienced drug-trafficking investigators, this pattern of phone activity in the first week of October 2013 . . . indicated it was likely that Christian was ceasing using [TT #10] to communicate with" Reza and perhaps other co-conspirators and "had likely switched to a new

phone to do so." Id. at 11. Based on this evidence, the government contends that it was not misleading for the affiant to state that the defendant had stopped using TT #10 to communicate with Reza. Id.

Although the affidavit's representation that the defendant "ha[d] stopped" using TT #10 was not accurate, the inaccuracy was not material to probable cause. Had the affidavit included the toll record data defendant cites or simply stated that the defendant was not using TT #10 as much, the probable cause to find that he was also using the Samsung Galaxy would not have been eroded. The toll data clearly showed that defendant continued to be in regular communication with Reza, therefore he was still dealing drugs, and the June 6 conversation showed that Christian had just gotten a "new number," which showed that defendant used several phone numbers, and therefore it was reasonable to infer that he might be using the Samsung Galaxy in addition to TT #10 to communicate with co-conspirators. Given the limited significance of the toll record data, the inaccurate statement does not support an inference that the affiant intended to mislead the magistrate judge. Lull, 824 F.3d at 117.

The second alleged misrepresentation—that the defendant was using the Samsung Galaxy to communicate with co-conspirators—was included in defendant's argument about the alleged misrepresentation that defendant had stopped using TT #10. This argument focuses solely on the absence of communications between Reza's cell phone and the Samsung Galaxy in the month leading up to the Ping Warrant. Def. Mem. at 16. The government responds that the affidavit describes the defendant frequently using the Samsung Galaxy to communicate with Jamie Christian and references the July 17, 2013 intercepted conversation with Rebollar as evidence supporting the agent's belief that Jamie Christian and the defendant were conspiring to traffic drugs. Gov. Opp. at 12-13. Defendant argues that the evidence of defendant's communications

with Jamie Christian was stale, as the last communication referenced in the warrant was July 17, 2013, over two months before the warrant was prepared. Reply at 7. The Court finds that the staleness of the communication does not weaken the inference that the defendant was using the Samsung Galaxy to communicate with Jamie Christian regarding drug dealing. And, because defendant cannot show that the factual statements supporting the inference regarding use of the Samsung Galaxy were false, there is no basis to infer that the affiant intended to mislead the magistrate judge.

Finally, with respect to the last two alleged omissions, neither satisfies the two-prong test for a Franks hearing. First, defendant criticizes the affiant for failing to mention that law enforcement had identified two other phone numbers that the defendant was using to communicate with co-conspirators. Def. Memo. at 8. As discussed above, it is common knowledge that drug dealers routinely use numerous phones. Explicitly identifying two other phone numbers used by Christian to communicate with co-conspirators would not have undercut probable cause. This information was not material, and there is no reason to infer that it was omitted with intent to deceive.

Defendant also claims that the affidavit failed to disclose that law enforcement already knew Christian's address because that information was on file with his probation officer. Def. Mem. at 8. This argument, which assumes that the purpose of the warrant was limited to determining where Christian lived, is belied by the affidavit which stated that one of the purposes of gathering location information was to "assist law enforcement in . . . identifying the locations where [the suspects were] conducting drug trafficking-related activity." Id. ¶ 60. In light of these representations, the alleged omission was immaterial to probable cause.

Having failed to establish that any of the alleged misrepresentations or omissions were material, much less made with the intent to mislead the magistrate judge, the defendant is not entitled to a Franks hearing regarding the Ping Warrant and has failed to disprove the good faith of the officers. For all these reasons, the motion to suppress the evidence obtained from that search has been denied.

3. Search Warrant for Apartment B

As with the Ping Warrant, defendant challenges the Apartment B Warrant, arguing that it was not supported by an affidavit establishing probable cause and contending, again, that he is entitled to a Franks hearing. The probable cause argument is based on the claim that the affidavit relied on evidence from the "illegal search of the Samsung Galaxy" and failed to establish a sufficient nexus between the defendant and Apartment B. Def. Mem. at 26-27. Defendant also claims that the affidavit contains a series of intentional and material misrepresentations and omissions that merit a Franks hearing. Def. Mem. at 23-26. The evidence seized from Apartment B, which defendant moves to suppress, includes three cell phones, two iPads, three keys, one MacBook Air and $780.00 in U.S. currency. Def. Ex. 24 at 4.

a. The Affidavit

On October 15, 2003, one week after the Ping Warrant was authorized, the government charged 22 defendants by criminal complaints, including Christian and Reza, and obtained arrest warrants for them. Gov. Opp. at 20. As the government explains, "[i]n an effort to arrest as many defendants as possible and prevent the destruction of evidence, the agents planned to effect arrests and search various residences in a coordinated and simultaneous manner." Id.

FBI Special Agent Clayton Hicks prepared a single affidavit ("the Hicks Affidavit") in support of multiple search warrants for locations in North Carolina, including 1101 Anderson

Place, High Point, North Carolina, the address defendant listed on his driver's license and recorded in his probation records. Def. Ex. 23. The search warrants were executed on the morning of October 17, 2013 but agents did not locate the defendant at 1101 Anderson Place. Gov. Opp. at 20-21. They later received information that the defendant had spotted law enforcement approaching and fled. Id. at 21.

Relying on evidence collected from the Ping Warrant, interviews, and physical surveillance, law enforcement identified 7027 West Friendly Avenue, Apartment B, Greensboro, North Carolina as another location where Christian sometimes stayed and applied for a new search warrant. Id. The affidavit in support of that warrant was prepared by FBI Special Agent Norman Kuylen ("Kuylen Affidavit") and, on October 18, 2013 was sworn out before the same magistrate judge in North Carolina who approved the search warrant for 1101 Anderson Place. See Hicks Aff., Def. Ex. 23 at 44; Kuylen Aff., Def. Ex. 25 at 12. The Kuylen Affidavit incorporated the Hicks Affidavit. Kuylen Aff. ¶ 10.

The Hicks Affidavit described the background of the criminal conspiracy and the evidence linking defendant to the conspiracy, including the telephone conversations between Reza and the defendant on June 6-7 and 28-29, 2013, which were included in the affidavit for the Ping Warrant. Hicks Aff. ¶¶ 40-42. In establishing probable cause to search 1101 Anderson Place, the affidavit represented that the defendant lived there "at least part time," id. ¶ 70, inviting the inference that he might also live somewhere else part of the time. This statement was supported by location data received through the Ping Warrant, which placed defendant at the 1101 Anderson Place location for only a few hours over a four-day period: "between approximately 1 a.m. and 3 a.m. on October 10, 2013" and "on Friday, October 11, during the evening, and Sunday, October 13, in the morning." Id. The affidavit went on to conclude that

"there [was] probable cause to believe that the individuals exercising control over the target locations are actively involved in a conspiracy to distribute cocaine and that many of these individuals have discussed explicitly, and other evidence has established, that within their residences they maintain items related to their involvement in the conspiracy." Id. ¶ 71.

Building on evidence that defendant was only at 1101 Anderson Place part of the time, the Kuylen Affidavit represented that, based on the Ping Warrant, Christian "appeared to have spent the night at the Target Location every night between October 10 and October 15, 2013." Kuylen Aff. ¶ 12. The affiant also described physical surveillance conducted at 7027 West Friendly Avenue on October 15, 2013:

> At approximately 5:05 p.m., location data showed that CHRISTIAN was in the immediate vicinity of the Target Location. At approximately 5:22 p.m., CHRISTIAN was observed walking from apartment building 7027 to a reddish brown colored Infiniti with a temporary license plate. CHRISTIAN was followed as he drove to a UPS Store, and then to 805 Worth Street, in High Point, North Carolina. At approximately 6:09 p.m., location data showed that CHRISTIAN was in the immediate vicinity of 805 Worth Street. At approximately 6:33 p.m., CHRISTIAN left a residence and travelled to a restaurant located at 3000 High Point Road, Greensboro, North Carolina. Surveillance was terminated shortly thereafter. From approximately 6:46 p.m., until approximately 10:41 p.m., location data showed that CHRISTIAN was located at the restaurant on High Point Road. After leaving the restaurant, CHRISTIAN made several other stops throughout the night. He returned to the Target Location at approximately 5:23 a.m., where he remained for at least the next seven hours.
>
> On October 16, 2013, law enforcement contacted the apartment manager for the Target Location. The apartment manager said that she has seen CHRISTIAN at the apartment complex several times since February of 2013, and as recently as that very morning. She said that on several occasions, including on October 16, she saw CHRISTIAN with the lease holder of Apt H.
>
> On October 17, 2013, law enforcement arrived at a residence in the 1100 block of Anderson Place, in High Point, North Carolina, and attempted to arrest CHRISTIAN pursuant to an arrest warrant issued in the Eastern District of Virginia. Individuals that were present at the residence when law enforcement arrived said that CHRISTIAN saw the law enforcement vehicles approaching, and fled on foot to avoid law enforcement detection.
>
> Later, on October 17, 2013, in an effort to locate CHRISTIAN, law enforcement contacted one of the occupants of apartment H, and inquired about CHRISTIAN. The occupant of apartment H said that CHRISTIAN lives in

apartment B (the Target Location) and that he has seen CHRISTIAN coming and going from apartment B many times.

Id. ¶ 12-14.

As with the Hicks Affidavit, the Kuylen Affidavit represented that "there [was] probable cause to believe that the individual exercising control over the TARGET LOCATION is actively involved in a conspiracy to distribute cocaine and that he has discussed explicitly, or other evidence has established, that within his residence he maintains items related to his involvement in the conspiracy." Id. ¶ 15.

b. Probable Cause Analysis

Defendant first argues that the evidence seized pursuant to the Apartment B Warrant should be suppressed because information in the affidavit included GPS location data which had been obtained under the allegedly invalid Ping Warrant and was therefore "fruit of the poisonous tree." Def. Mem. at 26. This argument fails because the Ping Warrant was not defective.

Defendant's second argument is that the affidavit failed to establish a sufficient nexus "connecting [Apartment B] with criminal activity," id. at 26, in that the defendant later elaborates: "The affidavit in this case was completely devoid of facts from which a magistrate could infer even the existence of drug activity at [Apartment B]." Id. at 28. As an initial matter, this argument again misstates the nexus requirement. Grossman establishes that there need not be "factual assertions directly linking the items sought to the defendant's residence." 400 F.3d at 217 (internal quotation marks omitted). Rather, it is "it is reasonable to suspect that a drug dealer stores drugs in a home to which he owns a key," even if it is one of several homes. Id. at 218. Similarly, Lull states that "the nexus requirement [is] satisfied when there was evidence that the suspect was involved in the crime, coupled with the reasonable suspicion . . . that drug traffickers store drug-related evidence in their homes" provided that the affidavit establishes "the

connection between the drug trafficker and his or her residence." 824 F.3d at 119 (internal quotation marks omitted).

The affidavit clearly satisfies <u>Lull</u> by showing defendant's involvement in drug trafficking, Hicks Aff. ¶¶ 40-42, and by explaining that, based on the affiant's experience and training, "[d]rug traffickers commonly maintain at their residences . . . additional quantities of the illicit drugs being distributed," as well as records and other papers regarding drug trafficking. Kuylen Aff. ¶¶ 16(a)-(b). In addition, the affidavit clearly connects Christian to Apartment B. The location data from the Ping Warrant placed him at the West Friendly Avenue location five nights in a row, agents observed him there three days before the warrant was authorized, the apartment manager stated that she had seen him on the property numerous times, including as recently as October 16, when he was seen with the occupant of Apartment H, and the occupant of Apartment H stated that the defendant lived in Apartment B. Kuylen Aff. ¶¶ 12-14. Although defendant argues that officers already knew that his address of record was 1101 Anderson Place, Def. Mem. at 27, the evidence shows that defendant was not found there and his connection to 1101 Anderson Place does not negate his nexus to Apartment B. Moreover, because the Hicks Affidavit was incorporated in the Kuylen Affidavit, both of which were reviewed by the same magistrate judge, the magistrate knew that defendant potentially lived at 1101 Anderson Place as little as "part time" and that the Hicks Affidavit represented that the location data only placed the defendant at 1101 Anderson Place for a total of a few hours during the period from October 10 to October 13. Hicks Aff. ¶¶ 70-71. Thus, here, as in <u>Grossman</u>, that the defendant "splits his time among several different homes," does not make the search of one of those homes invalid. 400 F.3d at 218.

    c.   <u>Good Faith</u>

Even if defendant could establish the absence of probable cause, <u>Leon</u>'s good faith exception applies to this search because the officers relied in good faith on a facially valid warrant. Defendant protests that <u>Leon</u> is inapplicable because the warrant fits within the first and third <u>Leon</u> exceptions. Def. Mem. at 30. These are the same arguments made with respect to the Ping Warrant. As before, the Court finds that the first exception—deliberately misleading the magistrate—does not apply, for reasons discussed below. Regarding the third exception, defendant has failed to establish that the affidavit is so lacking in indicia of probable cause as to render official belief in it entirely unreasonable. To the contrary, the Kuylen Affidavit and the incorporated Hicks Affidavit established probable cause to believe defendant was involved in criminal activity, a premise that the defendant does not challenge. It also explained that drug dealers frequently store evidence of drug dealing at their residence and cited evidence showing that the defendant stayed at Apartment B. Moreover, even if it were possible for a court to look at the evidence in the affidavit and conclude that the nexus between the defendant and Apartment B was too tenuous for probable cause, it was not so tenuous as to be facially invalid. Therefore the Court finds that the good faith exception applies.

        d.   <u>Franks Hearing</u>

Defendant contends that the affidavit for the Apartment B Warrant, in addition to lacking probable cause, contains false statements and omitted material facts that entitle him to a <u>Franks</u> hearing. Def. Mem. at 23-26. Defendant alleges six false or misleading statements and the alleged omissions span 15 bulleted paragraphs. <u>Id.</u> The Court need not address each of the allegedly misleading or omitted statements because most are merely disagreements about how the affidavit characterized information. For example, defendant argues that the affiant's statement that law enforcement "has determined" that the defendant resides at Apartment B

"overstated the confidence with which the statement was made." Id. at 23. Others simply repackage an alleged mischaracterization as an omission. For example, defendant represents that the affidavit omitted "facts supporting the conclusory statement" that law enforcement determined that the defendant resides at Apartment B. Id. at 23-25. This is blatantly untrue. The affidavit provides two pages of facts supporting that conclusion ranging from location data and surveillance to interviews with the apartment manager and the occupant of Apartment H. Kuylen Aff. ¶¶ 12-14. In addition, many of the alleged omissions are plainly irrelevant or immaterial, such as the mistaken detention of Christian's cousin on October 17, that agents had received a list of tenants on October 15 and narrowed their search for Christian to Apartments A-J, and that the Samsung Galaxy was seized during the October 17 search at 1101 Anderson Place. Def. Mem. at 24-26.

Many of the alleged misrepresentations and omissions focus on the accuracy of the location data. For example, the defendant criticizes the statement that location data showed that the defendant "appeared to have spent the night at the Target Location" and other statements placing defendant at the Target Location using location data because the "Target Location" was defined as Apartment B and the location data was not precise enough to establish which unit defendant was in. Def. Mem. at 23; Reply at 9. Elsewhere, defendant argues that the affidavit improperly failed to inform the magistrate that the "GPS location data only provided law enforcement with the ability to detect that the Samsung Galaxy was in the vicinity of apartment building 7027" not that he was inside Apartment B. Def. Mem. at 24. The government "acknowledges that a handful of statements about the GPS ping location data in the Kuylen Affidavit could have been more clear if (1) either the statements had used the phrase 'in the vicinity of' rather than 'in,' 'at,' or 'to' the Target Location, or (2) the statements had referred to

the 7027 West Friendly Ave. building rather than the defined phrase 'Target Location.'" Gov. Opp. at 26. The Court agrees, but it also agrees with the government that "[n]otwithstanding any imprecise language in the affidavit," "none of the purported false statements or omissions identified by the [d]efendant satisfy his two-pronged Franks burden." Id. at 27. First, the inaccuracies at issue are less indicative of intent than "negligence or innocent mistake," both of which are insufficient to require either a Franks hearing or suppression. See Franks, 438 U.S. at 171. Second, the inaccuracies are immaterial because, even if the inaccurate statements regarding location data are omitted, the affidavit still contains evidence that location data placed the defendant "in the immediate vicinity" of the 7027 West Friendly Avenue building from October 10 through 15, coupled with the agents' physical surveillance, the apartment manager's statement that she had repeatedly seen defendant at the property and in the company of the occupant of Apartment H, and the occupant of Apartment H's representation that the defendant stayed in Apartment B, there was more than enough evidence to establish probable cause to search Apartment B. Including the omitted facts regarding the accuracy of location data would only contextualize the location data that defendant alleges is currently misleading and would not have destroyed probable cause.

Defendant argues that the affiant failed to include that on October 16, 2013 the FBI verified that the defendant also stayed in Apartment H. Def. Mem. at 25. Including that information in the affidavit would not have undercut probable cause to search Apartment B because the affidavit states that the apartment manager said she saw the defendant "with the lease holder of [Apartment] H" on "several occasions". That fact established that someone other than the defendant was the occupant of Apartment H. She also stated that the occupant of Apartment H was familiar with defendant, and it was the occupant of Apartment H who told

agents that defendant lived in Apartment B. Kuylen Aff. ¶¶ 12, 14. That evidence both acknowledges the defendant's connection to Apartment H and supports the affiant's belief that the defendant had repeatedly stayed in Apartment B.

Defendant also attacks the affidavit's representations about the credibility of the occupant of Apartment H and his specific statements. With respect to accuracy, the defendant criticizes the affiant for both mischaracterizing the occupant's language as "Christian lives in Apartment B" and accuses the government of omitting the occupant's actual statement that "[T]win stays downstairs in apt. B." Def. Mem. at 23, 25. This information comes from an email written by Special Agent Hicks to fellow law enforcement officers on the afternoon of October 17, 2013. Def. Ex. 31. The difference between the language in the affidavit and the email is subtle, and is not material as both support the reasonable conclusion that defendant was connected to Apartment B . See Grossman, 400 F.3d at 218 (finding defendant's argument that he merely "stay[ed] as a guest in each residence for two to three days a week" but "[did] not reside in any of the three searched homes" inapposite); Williams, 974 F.2d at 481 (upholding a search of a defendant's hotel room because, even though the affidavit contained no specific facts that evidence was located there, the affidavit "establish[ed] a fair probability that drug paraphernalia would be found" therein).

As to credibility, the defendant argues that affiant "failed to disclose the fact that the occupant of Apartment H was not an ordinary citizen," and that on October 17, 2013 agents arrested the occupant on three outstanding warrants. From these facts defendant argues that the affidavit should have represented that the occupant of Apartment H "provided the FBI with information about Christian in an attempt to secure his release on bond and benefit from cooperation." Def. Mem. at 25. Although it would have been a better practice to have included

the arrest information, a criminal record does not, by itself, undermine the occupant's credibility because it is not the sort of "demonstrated unreliability" that the Fourth Circuit has found material to probable cause. See, e.g., Lull, 824 F.3d at 118. As to defendant's suggestion that the occupant's desire to cooperate undermined his credibility, the Fourth Circuit has found the opposite: an "informant's interest in obtaining leniency create[s] a strong motive to supply accurate information." See United States v. Miller, 925 F.2d 695, 699 (4th Cir. 1991). Although the circumstances of the occupant of Apartment H were relevant, inclusion of that information would not have negated probable cause.

Perhaps the most significant problem identified by defendant, and the one given the most attention by the government, is the affidavit's erroneous statement that the defendant "has discussed explicitly, or other evidence has established, that within his residence he maintains items related to his involvement in the conspiracy." Kuylen Aff. ¶ 15. The government "concedes" that "there was not, in fact, any evidence indicating that the defendant had discussed maintaining items relating to the drug conspiracy within [Apartment B]." Gov. Opp. at 23. According to the government, the inaccuracy was "inadvertent" and occurred due to "the rapid unfolding of events once the investigating agents obtained search warrants" for multiple target properties. Id. Irrespective of the reason for the misrepresentation, the Court finds that it was not material. To arrive at this conclusion, the Court excised this statement from the affidavit and considered whether the contents remained sufficient to establish probable cause. Franks, 438 U.S. at 171-72. In doing so, it is clear that this statement was not necessary to support probable cause. Grossman explicitly states that the affidavit need not contain "factual assertions directly linking the items sought to the defendant's residence." 400 F.3d at 217 (internal quotation marks omitted). Instead, the connection can be established inferentially, Anderson, 851 F.2d at 729.

Here, the affiant's representation that drug dealers frequently have drugs and records in their home supports the inference that evidence of drug trafficking was likely to be found at Apartment B; therefore, if the inaccurate statement were excised from the affidavit, there would still have been probable cause for the search.

### III.    CONCLUSION

For the reasons stated above, defendant's Motion to Suppress Evidence and for a <u>Franks</u> Hearing [Dkt. No. 73] has been denied.

The Clerk is directed to forward copies of this Memorandum Opinion to counsel of record.

Entered this 24 day of May, 2017.

Alexandria, Virginia

/s/

Leonie M. Brinkema
United States District Judge