IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| BRENNAN CHRISTIAN, ) | |
| ) | |
| Movant, ) | |
| ) | No. 1:19-cv-1058 (LMB) |
| v. ) | Crim. No. 1:16-cr-207 (LMB) |
| ) | |
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Respondent. ) | |

## MEMORANDUM OPINION

Before the Court is movant pro se Brennan Christian's ("movant" or "Christian") Motion to Vacate, Set Aside or Correct Sentence ("Motion to Vacate") under 28 U.S.C. § 2255, in which he argues that his conviction and sentence should be vacated due to various purported errors by the Court, the government, and defense counsel in connection with his 2017 conviction for conspiracy to distribute five kilograms or more of cocaine in violation of 21 U.S.C. §§ 841(a)(1), 846. The government has filed a response and Christian has filed a reply. For the reasons stated below, Christian's Motion to Vacate will be dismissed.

I.

In May 2012, federal and state law enforcement agencies began a joint investigation into the cocaine distribution activities of Tony Bowles ("Bowles"), which were based in the Eastern District of Virginia. [Dkt. 258 ¶ 18].[1] During this investigation, Johnnie Hill ("Hill") was identified as one of Bowles' primary sources of supply, and Marciano Reza ("Reza") was identified as one of Hill's potential sources of supply. Id. ¶¶ 20–21. Reza worked closely with

---

[1] References to specific pleadings are reflected as "Dkt. _" or "Dkt. _ ¶ _." References to trial transcripts are reflected as "Dkt. _ at _:_," with the page and line numbers of the cited testimony separated by a colon, e.g., Dkt. 274 at 1:20–2:12.

several family members and others to purchase and distribute kilogram-quantities of cocaine, primarily in North Carolina. ¶ 22–23, 28, 32. One such family member was his wife's cousin, who was known as "Twin." Id. Reza both supplied cocaine to, and in turn was occasionally supplied cocaine by, "Twin," depending on their respective needs. Id. For example, in early June 2013, Reza purchased nine kilograms of cocaine from a third party, two of which were for "Twin," and in late June 2013, "Twin" supplied Reza with three kilograms of cocaine. Id. ¶¶ 26–27.

Christian was positively identified as "Twin" following law enforcement's investigation of an August 6, 2013 post made on the Facebook page of Reza's wife. Id. ¶ 28. Upon execution of a search warrant, agents located a post which stated: "Hey cuzn have yall lef 4 beach yet?" Id. That post originated from a Facebook account associated with Christian, including through a photograph of the account user, which matched a prior booking photograph of Christian. Id. Additionally, agents determined that Christian had a twin brother, who was incarcerated in North Carolina on convictions for drug trafficking and firearms offenses. Id. Throughout this investigation, agents utilized confidential sources, controlled purchases, and multiple court-authorized wiretaps, among other investigative methods, as discussed further below. Id. ¶¶ 19, 30.

On October 15, 2013, a criminal complaint was issued against Reza, Christian, and several others affiliated with Reza, charging them with one count of conspiracy to distribute five kilograms or more of cocaine, in violation of 21 U.S.C. §§ 841(a)(1), 846. [Dkt. 1]. A second complaint was issued against Bowles, Hill, and numerous others affiliated with Bowles, charging them with the same offense. See United States v. Bowles, Case No. 1:13-cr-476, Dkt. 1. Both complaints were supported by the same affidavit. [Dkt. 2]; see also Bowles, Dkt. 2. All of these

individuals were subsequently arrested and all but Christian and one of Bowles' associates eventually pleaded guilty before the undersigned judge. [Dkt. 58 ¶¶ 9–12]; see also Bowles, Dkt. 134 ¶¶ 6–22.

As for Christian, on September 13, 2016, a federal grand jury returned an indictment charging him with one count of conspiracy to distribute five kilograms or more of cocaine in violation of 21 U.S.C. §§ 841(a)(1), 846. [Dkt. 61]. On April 28, 2017, after a three-day jury trial, the jury was unable to reach a unanimous verdict and a mistrial was declared. [Dkt. 178]. The government subsequently decided to re-try Christian on the same charge. [Dkt. 179]. On August 4, 2017, after a second, three-day jury trial, the jury found Christian guilty. [Dkt. 245, 246].

During the trial, the central issue was whether the government could prove that Christian was "Twin." [See Dkt. 261]. The government presented a substantial amount of evidence on this issue, including: the testimony of two co-conspirators who identified Christian as "Twin," [Dkt. 274 at 125:20–25; Dkt. 275 at 308:20–24]; text messages recovered from Christian's mobile phone, which was seized during a search of his residence, in which he identified himself and was identified by others as "Twin," [Dkt. 274 at 18:10–19:11; Dkt. 276 at 480:79:23–480:3, 493:2–495:15]; and letters seized during a search of Christian's residence which were addressed to "Twin," [Dkt. 274 at 26:16–21]. Additional evidence on this issue involved a second mobile phone which was initially known only as a phone used by "Twin" but was later determined to be Christian's second mobile phone. [Dkt. 275 at 365:6–19]. This second phone was one of many mobile phones for which law enforcement agents obtained court-authorized wiretaps, and as a result is referred to as "TT10," which stands for "Target Telephone 10." [Dkt. 275 at 365:6–19]. Numerous conversations over TT10 dealt with drug transactions. The government presented

significant evidence that TT10 was Christian's second mobile phone, including: phone geolocation data showing that both Christian's first mobile phone and TT10 were often in similar locations at similar times, [Dkt. 275 at 429:18–433:3, 441:9–446:15]; as well as intercepted text messages and phone calls to and from TT10 referring to "Twin's" locations and activities, which matched Facebook records of Christian's locations and activities, such as visiting an establishment called the "King of Diamonds" on July 7, 2013, contacting a co-conspirator's wife on August 6, 2013, and attending a funeral on October 13, 2013. [Dkt. 275 at 406:12–410:2, 417:9–419:1; Dkt. 276 at 507:6–509:12].

Some of this evidence was presented in the form of Cellebrite Extraction Reports, which are forensic analyses of data extracted from mobile phones. [See Dkt. 261]. In short, a Cellebrite Extraction Report lists all call logs, contacts, text messages, and data files on a mobile phone at the time of the extraction, which is conducted using Cellebrite technology. Id. During the trial, the government presented Cellebrite Extraction Reports for three mobile phones: Christian's first mobile phone, TT10, and a mobile phone which belonged to Reza. [Dkt. 276 at 474:11–476:6, 479:23–480:11, 503:25–505:16]. As relevant here, the text messages in which Christian identified himself and was identified by others as "Twin" came from the Cellebrite Extraction Report of Christian's first mobile phone, and the text messages in which "Twin" indicated that he attended a funeral on October 13, 2013 came from the Cellebrite Extraction Report of Reza's phone. [Dkt. 276 at 493:2–495:15, 503:25–505:16; see also Dkt. 261].

The pertinent portions of the three Cellebrite Extraction Reports were admitted during the testimony of FBI Special Agent Kenneth Smith, the case agent who conducted the extractions. [Dkt. 275 at 358:8–10, 450:9–12; Dkt. 276 at 503:25–504:7]. FBI Special Agent Ryan Lamb, who assisted in the extractions, also testified. [Dkt. 276 at 632:14–20, 638:9–13]. As relevant

here, the parties disputed whether Agent Lamb should be qualified as an expert witness in forensic mobile phone analyses. Agent Lamb testified that he had been an agent with the FBI's Computer Analysis Response Team for three years, and in that capacity conducted and analyzed data extractions from mobile phones and computers. [Dkt. 276 at 625:11–626:10]. He also testified that before joining the FBI's Computer Analysis Response Team he had spent two years training other FBI agents in the use of Cellebrite technology, and that he had taken numerous courses over his career on forensic mobile phone and computer analyses. Id. Agent Lamb explained that he had conducted mobile phone extractions "[o]ver 100 times," "predominantly" using Cellebrite technology. [Dkt. 276 at 626:20–627:5, 630:4–10].

When the government moved to qualify Agent Lamb as an expert witness, defense counsel sought and received permission to conduct a voir dire examination. [Dkt. 276 at 627:6–13]. During the examination, defense counsel probed Agent Lamb's training. For example, she asked whether a five-day mobile phone forensics course that Agent Lamb had attended in 2016 was "really relevant" given that only one day focused on the type of phones at issue "in this case," to which Agent Lamb responded that "the principles that were discussed" throughout the five-day course "are consistent across the different [types of] mobile devices." [Dkt. 276 at 629:8–13]. Defense counsel also asked whether Agent Lamb had attended a Cellebrite Certified Local Operator Training or been certified as a Cellebrite Certified Physical Analyst, to which Agent Lamb responded that he had not. [Dkt. 276 at 629:23–630:3]. Additionally, defense counsel asked about the specific devices Agent Lamb had analyzed over his career, and Agent Lamb confirmed that he had "analyzed over 100 cell phones" and "more than 50 computers," "averaging about 30 devices a year." [Dkt. 276 at 631:3–13]. Following the voir dire examination, defense counsel objected to Agent Lamb's qualification as an expert "based

5

on . . . the limited training that he's had," and the Court denied the objection "because one of the bases for expertise can also just be experience," as opposed to "formalized training." [Dkt. 276 at 632:1–7].

Agents Smith and Lamb both testified that there are multiple types of extractions that can be conducted on a mobile phone. [Dkt. 276 at 476:10–11, 639:11–12]. A "logical" extraction is "a very simple type of extraction" that is "comparable to a file copy, where you're dragging and dropping files from one [location] to another location," and it "may not recover deleted items off a phone." [Dkt. 276 at 476:14, 636:16–17, 639:18–20]. An "ADB" extraction "offers more options of different types of data that can be extracted" and "has a potential to get [more] data," such as deleted items, which a "logical" extraction cannot reach. [Dkt. 276 at 480:20–21, 639:20–21]. Agent Smith added that in conducting either type of extraction, "the same general method is used:" "[t]ake the cell phone, turn it on, put it in airplane mode, attach it with a USB cable from the phone to the computer system," and then the Cellebrite technology "walks [the agent] through" the extraction process. [Dkt. 275 at 449:5–10; Dkt. 276 at 477:11, 480:23]. Agent Smith also added that the data capable of being extracted in either type of extraction is "dependent on the type of phone." [Dkt. 275 at 449:21–22]. Specifically, only a "few items," such as "call logs, contacts, [and] possibly text messages," can be extracted from a non-smartphone, whereas "[b]asically anything" can be extracted from a smartphone, including "photos" and "application[s]." [Dkt. 275 at 449:21–450:5]. As relevant here, a "logical" extraction was conducted on TT10, which was a non-smartphone, and an "ADB" extraction was conducted on Christian's first mobile phone and on Reza's mobile phone, which were smartphones. [Dkt. 275 at 450:20–24; Dkt. 276 at 476:7–14, 610:8–18, 636:13–17].

6

On August 18, 2017, following his conviction, Christian filed a Motion for New Trial in which he argued that the Cellebrite Extraction Report for Reza's phone was both inaccurate and belatedly disclosed by the government. [Dkt. 248, 249]. Specifically, Christian argued that the Cellebrite Extraction Report noted that Reza created a contact named "B" on June 21, 2013, approximately 17 days before Reza received a text message from "B's" new phone number, which suggested that the data extracted from Reza's phone had been "modified or altered." Id. That text message, which was sent to Reza from TT10 and stated "Yo twin new number," was one piece of evidence linking TT10 and "Twin." Id. In addition, Christian argued that he was "severely prejudiced" by the government's failure to disclosure the Cellebrite Extraction Report until "one month prior to trial." Id.

On November 1, 2017, Christian's Motion for New Trial was denied. [Dkt. 261]. The Court reasoned that the government had "explain[ed] the inconsistencies" in the Cellebrite Extraction Report for Reza's phone through the testimony of Agent Lamb, who had explained that the date a contact was created "refer[s] to the date that that contact was created in the phone," which would "[n]ot necessarily" change "if the contact got a new number" and his or her contact information was "modified" accordingly. Id. This explanation was "entirely consistent with the government's theory at trial," which was that "Christian purchased [TT10] . . . in July 2013" and texted Reza the number for TT10, after which Reza "updated 'B's' phone number to [TT10's] number." Id. Moreover, "[e]ven if there were a potential problem with this singular piece of evidence, the government presented significant additional evidence at trial to prove Christian's identity as 'Twin,'" including the testimony of two co-conspirators who identified the defendant as "Twin." Id. With regard to the government's disclosure of the Cellebrite Extraction Report for Reza's phone, the Court reasoned that the government disclosed it "shortly after it

obtained the information pursuant to a search warrant," for which it "had not previously applied . . . because Reza and other co-conspirators had all decided to plead guilty in 2014." Id. The government also produced its trial exhibits a week before trial, "giving defense counsel nearly five days to analyze [the] two pages" of the Cellebrite Extraction Report which the government intended to admit into evidence. Id.

On November 3, 2017, Christian was sentenced to 138 months' imprisonment and five years of supervised release. [Dkt. 263, 264]. On November 16, 2017, Christian appealed his conviction and the denial of his Motion for New Trial to the Fourth Circuit. [Dkt. 267]. On appeal, Christian argued that "the district court erred by denying motions to suppress evidence seized from [his] cell telephone and an apartment, denying his request for a hearing pursuant to Franks v. Delaware, 438 U.S. 154 (1978), admitting evidence of historical cell phone data, and denying his motion for new trial." [Dkt. 279]. On September 9, 2018, the Fourth Circuit affirmed the decisions below in all respects, reasoning that "the affidavits filed in support of the search warrants authorizing GPS tracking of Christian's phone and the search of an apartment connected with Christian support[ed] the magistrate judge's conclusion that probable cause existed for the warrants," there was "no error" in the "denial of Christian's request for a Franks hearing," there was "no error" in the "decision not to suppress evidence seized after a search of historical cell cite records for Christian's phone," and that "the court did not abuse its discretion in denying the motion for a new trial." [Dkt. 279]. As relevant here, with regard to Christian's Motion for New Trial, the court explained that Agent Lamb "addressed the alleged discrepancies" in the Cellebrite Extraction Report for Reza's phone and that Christian "could have," "but did not," request additional testing of Reza's phone before trial. Id. Christian timely filed the Motion to Vacate which is now before the Court. [Dkt. 284].

8

II.

"A federal prisoner, in custody, may collaterally attack his sentence or conviction by moving the district court to vacate, set aside or correct the sentence pursuant to 28 U.S.C. § 2255." Umar v. United States, 161 F. Supp. 3d 366, 373 (E.D. Va. 2015). "To obtain such relief, a [movant] bears the burden of proving that his sentence or conviction was imposed in violation of the Constitution or laws of the United States, that the district court was without jurisdiction to impose such sentence, that the sentence exceeds the maximum authorized by law, or that the sentence is otherwise subject to collateral attack." Id. "[A] petitioner must prove the asserted grounds for relief by a preponderance of the evidence." Id. "However, a pro se [movant] is entitled to have his [motion] and issues asserted therein construed liberally." Pemberton v. United States, 352 F. Supp. 3d 610, 613 (E.D. Va. 2019). "Upon reviewing a § 2255 motion, the district court may, in its discretion, deny the motion without a hearing . . . if the motion and the files and records of the case show that the [movant] is entitled to no relief." Id.

Christian's Motion to Vacate asserts five grounds for relief. Liberally construed, the five grounds respectively allege (1) that the Court erred in qualifying Agent Lamb as an expert witness, (2) that the Court erred in admitting the two-page excerpt of the Cellebrite Extraction Report for Reza's phone, (3) that the government impermissibly failed to conduct and disclose the results of an "ABD" extraction, as opposed to a "logical" extraction, on TT10, (4) that defense counsel rendered ineffective assistance by failing to familiarize herself with the technologies involved in the case, including failing to retain an expert witness to review the Cellebrite Extraction Report for Reza's phone, and (5) that the Court's adverse rulings against Christian demonstrate impermissible judicial bias against him. Each ground will be discussed in turn; none is meritorious.

At the outset, "a habeas petitioner . . . procedurally defaults his claim unless he raises it . . . on direct appeal." United States v. Linder, 561 F.3d 339, 344 (4th Cir. 2009). As a result, a habeas petitioner who fails to raise an issue on direct appeal, other than ineffective assistance of counsel, "is forbidden to recast the issue in [his] habeas petition unless he can show 'cause' and 'actual prejudice' or a fundamental miscarriage of justice." United States v. Smith, 113 F. Supp. 2d 879, 898 (E.D. Va. 1999); see also Massaro v. United States, 538 U.S. 500, 504 (2003). Here, Christian's Motion to Vacate concedes, and the Fourth Circuit's decision confirms, that he did not raise his first, second, or fifth grounds for relief on direct appeal. [See Dkt. 279, 284]. Accordingly, those claims have been procedurally defaulted. To the extent that Christian attempts to establish cause and prejudice for the procedural default, in response to the question "If you did not raise this issue in your direct appeal, explain why," Christian stated only "Ineffective Assistance of [Appellate] Counsel," which is "entirely conclusory" and therefore insufficient to establish cause and prejudice. See, e.g., Couvington v. Clarke, 2018 WL 386157, at *3 (E.D. Va. Jan. 11, 2018). Nevertheless, the Court will address the merits of each ground for relief to alleviate any doubt as to the propriety of the actions taken by the Court, the government, and defense counsel. See, e.g., United States v. Roane, 378 F.3d 382, 399 (4th Cir. 2004).

### A. Ground 1

In his first ground for relief, Christian argues that Agent Lamb should not have been qualified as an expert witness because "usage of something does not make one an 'expert'" and Agent Lamb was "someone who merely used" the Cellebrite technology. [Dkt. 284, 291]. By way of example, Christian asserts that "[n]o doubt Agent Lamb drives a car almost every day, but that does not convey expertise in cars, not even in his own." [Dkt. 291]. In particular, Christian contends that "it was error to allow Agent Lamb to comment on the reliability of [the

Cellebrite Extraction Reports] in any way at all." Id. In response, the government argues it was "not error to qualify Agent Lamb as an expert witness regarding the forensic examination of cellular phones." [Dkt. 289]. The government has the better argument.

"Ascertaining whether a proffered witness is qualified to testify as an expert is a determination lying within the sound discretion of the trial court." Creekmore v. Maryview Hosp., 662 F.3d 686, 690 (4th Cir. 2011). "As the text of [Federal Rule of Evidence 702] itself indicates, a witness can be qualified as an expert on a particular topic by virtue of his experience as well as more formal training." United States v. Mack, 495 F. App'x 359, 363 (4th Cir. 2012). For example, courts frequently qualify law enforcement officers as expert witnesses when they have "extensive experience" in their respective fields. Id. (collecting cases).

Here, Agent Lamb's credentials confirm that he was well-qualified to testify as an expert in forensic mobile phone analyses. He had been an agent assigned to the FBI's Computer Analysis Response Team for three years, and in that capacity conducted and analyzed data extractions from a variety of mobile phones and computers. [Dkt. 276 at 625:11–626:2, 630:4–10]. He had also spent an additional two years training other FBI agents in the use of Cellebrite technology, and had taken numerous courses over his career on forensic mobile phone and computer analyses. Id. Indeed, he had extracted data from mobile phones "[o]ver 100 times," "predominantly" using Cellebrite technology and including extractions conducted on mobile phones manufactured by Samsung, the company which had manufactured all the phones at issue. [Dkt. 276 at 626:20–627:5; see also Dkt. 236]. Such "extensive experience" qualified Agent Lamb to testify as an expert witness in this case. Mack, 495 F. App'x at 363.

To the extent Christian is particularly concerned about Agent Lamb's testimony regarding the reliability of the Cellebrite Extraction Reports, his concern is unfounded. On re-

direct examination, Agent Lamb testified that he had never "encountered a situation where the Cellebrite extraction yielded false or inaccurate information." [Dkt. 276 at 663:13–15]. Even if Agent Lamb had not been qualified as an expert witness, that statement would have constituted proper lay witness testimony because it was based on his own "personal knowledge and perception," including his assistance in the extractions at issue. United States v. Roe, 606 F.3d 180, 186 (4th Cir. 2010); see also MCI Telecommunications Corp. v. Wanzer, 897 F.2d 703, 706 (4th Cir. 1990) (explaining that a witness "was a lay witness, whose identification as an expert witness . . . was not required," because her testimony was based on her personal knowledge and perception). Accordingly, Christian's first ground for relief will be dismissed.

B. **Ground 2**

In his second ground for relief, Christian argues that "[a]dmission of [the two-page excerpt of the Cellebrite Extraction Report for Reza's mobile phone] was in error" because "[t]here is proof in the extraction reports themselves that certain files on the device were modified after it had been in the possession of the government," the same "point [which] was raised in [his] post-conviction motion." [Dkt. 291]. Christian asserts that "[t]his tampering[] at the very least warrants an evidentiary hearing to determine the extent and viability of the information as evidence." Id. In response, the government argues that the Cellebrite Extraction Report was properly admitted, that this issue was "thoroughly addressed in this Court's order denying Christian's [Motion for New Trial]," which order was affirmed by the Fourth Circuit. [Dkt. 289]. The government has the better argument.

At the outset, Christian cannot raise this claim on collateral review because he previously raised it in his appeal of the denial of his Motion for New Trial and the Fourth Circuit rejected it. Specifically, the Fourth Circuit held that "the court did not abuse its discretion in denying the

motion for a new trial" because Agent Lamb "addressed the alleged discrepancies" in the Cellebrite Extraction Report for Reza's phone "at trial." [Dkt. 279]. "[A] petitioner cannot relitigate issues on collateral review that were previously decided on direct appeal." United States v. Caro, 733 F. App'x 651, 658 (4th Cir. 2018).

Even if Christian could raise this claim on collateral review, it would not be successful. "District judges generally enjoy broad discretion in ruling on the admissibility of evidence." United States v. Woods, 710 F.3d 195, 200 (4th Cir. 2012). Here, as the Court previously explained in denying Christian's Motion for New Trial, Christian's assertion that internal inconsistencies in the Cellebrite Extraction Report for Reza's phone warranted its exclusion is without merit. [See Dkt. 261]. Although the report stated that Reza created a contact from someone named "B" before receiving a text message from TT10 which included "B's" new phone number, Agent Lamb persuasively explained that the date a contact was created "refer[s] to the date that that contact was created in the phone," which would "[n]ot necessarily" change "if the contact got a new number" and his or her contact information was "modified" accordingly. Id. Moreover, this explanation was "entirely consistent with the government's theory at trial," which was that "Christian purchased [TT10] . . . in July 2013" and texted Reza TT10's number, after which Reza "updated 'B's' phone number to [TT10's] number." Id. There is simply no evidence supporting Christian's assertion that law enforcement officers "tamper[ed]" with Reza's phone or the Cellebrite Extraction Report. Accordingly, Christian's second ground for relief will be dismissed.[2]

---

[2] In connection with his third and fifth grounds for relief, Christian summarily states that the Cellebrite Extraction Report for Reza's phone contained several notations of phone activity which were dated "after the phone was in [the] [g]overnment's custody." [Dkt. 291]. This vague, conclusory statement, which is devoid of any further explanation, is neither meritorious nor sufficient to warrant an evidentiary hearing. See, e.g., Gualtero v. United States, 2017 WL

13

## C. **Ground 3**

In his third ground for relief, Christian argues that although a "complete extraction of all data" was conducted on Reza's mobile phone, "[t]his complete extraction of all data was not done on [TT10]" such that the government impermissibly "fail[ed] to provide [him with] all information in the possession of law enforcement." [Dkt. 284]. In other words, Christian argues that "[b]y only [conducting] a partial extraction of [TT10], the government withheld potentially exculpatory evidence in direct violation of [his] rights" under the Supreme Court's decision in Kyles v. Whitley, 514 U.S. 419 (1995). Id. In response, the government argues that the different extractions conducted "were merely related to the technical capabilities of law enforcement" given that TT10 was a not a smartphone. [Dkt. 289]. Christian's argument is unpersuasive.

In Kyles, the Supreme Court expounded on the materiality requirement of a claim that the government impermissibly withheld material, exculpatory evidence under Brady v. Maryland, 373 U.S. 83 (1963). See Juniper v. Zook, 876 F.3d 551, 567 (4th Cir. 2017). "To prevail on [a] Brady claim, [a habeas petitioner] must establish: (1) the evidence at issue is favorable to [him], either because it is exculpatory, or because it is impeaching; (2) that evidence was suppressed by [the government], either willfully or inadvertently; and (3) prejudice ensued." Id. at 564. Here, Christian asserts a Brady claim whereby the government impermissibly withheld data on TT10

---

4250532, at *3 (E.D. Va. Sept. 25, 2017) ("Courts construe a pro se litigant's pleadings liberally. However, the pro se litigant must include each ground supporting his claim for relief in his § 2255 motion, and he must state his factual allegations with sufficient particularity to give a reader enough notice to determine whether the motion requires further review. No hearing is required in a § 2255 proceeding . . . if the allegations in the motion are unreasonably vague, conclusory, or incredible . . . ."); see also United States v. Rivers, 2019 WL 4418992, at *4 (E.D. Va. Sept. 16, 2019) ("It was incumbent upon [the movant] to provide sufficient facts supporting each ground in his § 2255 motion. Because [he] presented nothing more than vague and conclusory claims, no further investigation is required by the Court.").

by failing to conduct and disclose the results of an "ADB" extraction, which may have recovered deleted items, as opposed to a "logical" extraction. [Dkt. 284, 291].

Christian cannot satisfy any of the requirements of his Brady claim. With regard to whether the evidence at issue is favorable to him, there is no indication that an "ADB" extraction on TT10 would have recovered any deleted items whatsoever, let alone items favorable to him, and "fail[ure] to demonstrate beyond a mere possibility that the [favorable evidence] even existed" is fatal to a Brady claim. United States v. Caro, 733 F. App'x 651, 663 (4th Cir. 2018); see also Luellen v. United States, 2011 WL 4565348, at *2 (E.D. Va. Sept. 28, 2011). Similarly, with regard to whether the government suppressed the evidence at issue, Christian's argument would have required the government to conduct an "ADB" extraction on TT10 to determine whether any deleted items existed, and "Brady did not create" a "general constitutional right to discovery in a criminal case." United States v. Wolf, 860 F.3d 175, 193 (4th Cir. 2017).

Even if Christian had satisfied the first two requirements of his Brady claim, he has plainly failed to satisfy the third requirement—materiality. Under Kyles, "exculpatory evidence is material if it could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." Juniper, 876 F.3d at 567. "Put differently, to establish materiality, a [habeas] petitioner must show that there is a reasonable probability that the result of the trial would have been different if the suppressed [evidence] had been disclosed to the defense." Id. "Under this standard, the question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." Id.

Here, as previously discussed, the government presented an abundance of evidence that Christian, who was actually a twin, was known to his co-conspirators as "Twin," of which the

15

Cellebrite Extraction Report for TT10 was merely one piece. Additional evidence included the testimony of two of Christian's co-conspirators who identified Christian as "Twin," letters seized during a search of Christian's residence which were addressed to "Twin," phone geolocation data showing that both Christian's first mobile phone and TT10 were often in similar locations at similar times, and intercepted text messages and phone calls to and from TT10 referring to "Twin's" locations and activities, which matched Christian's Facebook records of his locations and activities. [Dkt. 274 at 26: 16–21, 125:20–25; Dkt. 275 at 308:20–24, 406:12–410:2, 417:9–419:1, 429:18–433:3, 441:9–446:15; Dkt. 276 at 507:6–509:12]. In light of this substantial inculpatory evidence, Christian's hypothetical exculpatory evidence does not "put the whole case in such a different light as to undermine confidence in the verdict." Juniper, 876 F.3d at 567; see also Walker v. Kelly, 589 F.3d 127, 143 (4th Cir. 2009); Campbell v. Polk, 447 F.3d 270, 276 (4th Cir. 2006). Accordingly, Christian's third ground for relief will be dismissed.

### D. Ground 4

In his fourth ground for relief, Christian argues that defense counsel Nina Ginsburg made "multiple missteps" which indicated "her ignorance of the technologies involved at the heart of these trials," including "failure to seek an expert who could identify the faults in [the Cellebrite Extraction Report for Reza's phone]," and that had he been represented by more competent counsel, "it is likely . . . that the government would have lost outright at trial." [Dkt. 284]. In response, the government argues the Christian has not satisfied either of the prongs of the ineffective assistance test set out in Strickland v. Washington, 466 U.S. 668 (1984). The government has the better argument.

Under the two-prong test set out in Strickland, "[t]o demonstrate ineffective assistance of counsel, [Christian] must show (1) that [defense] counsel's performance was deficient, and (2)

that the deficient performance prejudice the defense." Rodriguez v. Bush, 842 F.3d 343, 346 (4th Cir. 2016). The first prong, referred to as the "performance prong," requires that defense counsel's performance "fell below an objective standard of reasonableness," and the second prong, referred to as the "prejudice prong," requires "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." United States v. Higgs, 663 F.3d 726, 735 (4th Cir. 2011). Here, Christian has not satisfied either prong.

As to the performance prong, there is "a strong presumption that counsel performed reasonably." United States v. Fulks, 683 F.3d 512, 517 (4th Cir. 2012). Christian asserts that defense counsel was "woefully ignorant of the technologies in this case;" however, that assertion is belied by the record. [Dkt. 291]. Defense counsel conducted thorough cross-examinations of both Agent Smith and Agent Lamb in which she demonstrated understanding of Cellebrite technology specifically and mobile phones generally. For example, she effectively questioned those witnesses about their knowledge of the software run by Cellebrite technology during the extraction process; the difference between a Cellebrite Extraction Report and phone company call records; the potential for data to be altered or missed during the extraction process; the formats in which mobile phones store data, such as hexadecimal and binary formats; how the software run by Cellebrite technology decodes and interprets data during the extraction process; the error rates in Cellebrite Extraction Reports; the import of the dates on which the Cellebrite Extraction Reports indicate a contact or image was created or modified; and the multiple places on mobile phones where data is stored. [Dkt. 276 at 572:1–25, 582:20–591:3, 648:24–650:42, 651:6–653:21, 659:7–662:11]. On this record, Christian has failed to present sufficient argument or facts to overcome the "strong presumption" that defense counsel performed reasonably. Fulks, 683 F.3d at 517. Indeed, the Court noted as much during Christian's sentencing, stating: "I don't

17

think there were any errors made by [defense counsel] in how she defended this case[;]" "she did a very vigilant job on behalf of this defendant." [Dkt. 278].

As to the prejudice prong, "[t]he standard for Strickland prejudice is the same as [the standard] for Brady materiality." Higgs, 663 F.3d at 735. As previously discussed, Christian has not satisfied that standard due to the overwhelming evidence that he was known to his co-conspirators as "Twin," which was the central issue at trial. See also Wolford v. United States, 722 F. Supp. 2d 664, 695 (E.D. Va. 2010). Accordingly, Christian's fourth ground for relief will be dismissed.

### E. Ground 5

In his fifth and final ground for relief, Christian argues that the Court exhibited impermissible "judicial bias" by "ma[king] adverse ruling[s] [on] a lot of [Christian's] issues" which evidenced "predisposed opinions about [his] guilt or innocence." [Dkt. 284, 291]. In response, the government argues that the issues to which Christian refers "were correctly decided by the Court," and that "the mere fact that the Court made several rulings against Christian . . . does not, without more, show judicial bias." [Dkt. 289]. The government has the better argument.

A judge should recuse himself or herself "if the judge's impartiality might reasonably be questioned." United States v. Lentz, 524 F.3d 501, 530 (4th Cir. 2008). "However, judicial rulings alone almost never constitute a valid basis for a bias or partiality motion," and "opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible." Id. "Even remarks made that are critical or disapproving of, or even

18

hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge." Id. "Put simply, the proper test to be applied is whether another with knowledge of all of the circumstances might reasonably question the judge's impartiality." Id.

Here, "[c]ontrary to [Christian's] assertions, neither the [trial and] sentencing transcript[s] nor the record as a whole provide any evidence that the [undersigned] harbored bias against [him][;] [r]ather, [his] argument appears to be based primarily on [his] disagreement with the [undersigned's] substantive rulings," which is insufficient to establish judicial bias. United States v. Johnson, 593 F. App'x 186, 189 (4th Cir. 2014). The only other evidence to which Christian points is the undersigned's statement at his sentencing hearing that "there was enough evidence at [Christian's] first trial beyond a reasonable doubt . . . upon which [Christian] could have been convicted," and that "[the] newer evidence that came in at the second trial was only . . . icing on the cake." [Dkt. 278]. Under Lentz, such a statement, particularly when made after the defendant's conviction, does not establish judicial bias. 524 F.3d at 530. Accordingly, Christian's fifth and final ground for relief will be dismissed.

III.

For the reasons stated above, Christian's Motion to Vacate will be dismissed by an Order to be issued with this Memorandum Opinion.

Entered this 15 day of June, 2020.

Alexandria, Virginia

/s/
Leonie M. Brinkema
United States District Judge